No. 00-760

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 166

STATE OF MONTANA,

      Plaintiff and Respondent,

  v.

MICHELLE BENOIT,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Marge Johnson, Judge presiding.

COUNSEL OF RECORD:

      For Appellant:

          Carl Jensen, Attorney at Law, Great Falls, Montana

      For Respondent:

          Hon. Mike McGrath, Attorney General;
Jim Wheelis, Assistant Attorney General, Helena, Montana

          Brant S. Light, Cascade County Attorney, Great Falls, Montana

Submitted on Briefs:  September 6, 2001

Decided:  July 25, 2002

Filed:

_____
Clerk

Justice Jim Regnier delivered the Opinion of the Court.

¶1 On November 30, 1999, Michelle Benoit ("Benoit") pled guilty in the Montana Eighth Judicial District Court, Cascade County, to the charge of felony theft. Benoit was sentenced to a six year deferred imposition of sentence subject, in part, to the condition that she pay restitution in the amount of $15,933.90. Benoit appeals both the restitution order and the length of her sentence. We affirm.

¶2 The following issues are presented for our review:

¶3 1. Whether the District Court erred in ordering Benoit to pay restitution in the amount of $15,933.90?

¶4 2. Whether the District Court violated Benoit's due process rights under Article II, Section 17, of the Montana Constitution by deferring imposition of her sentence for six years to allow payment of restitution?

FACTUAL AND PROCEDURAL BACKGROUND

¶5 Benoit was employed by Burger Master in Great Falls, Montana, in July 1997. In August 1999, Lynda Monroe ("Monroe"), the general manager of Burger Master, suspected that Benoit was stealing from the business while working at the cash register. Monroe videotaped Benoit for four consecutive days. The videotapes revealed that Benoit was stealing money by falsifying gold card sales. Benoit was observed keying gold card sales into the register when such sales had not actually occurred. Gold cards entitle customers to discounted prices. When a gold card entry is made in the register, the discounted price is automatically deducted from the amount owed

2

by the customer.  As a result, Benoit's customers would pay full price, she would subsequently pocket the difference between the actual price paid and the gold card price discount, and her till would balance properly at the end of the day.

¶6  During the four days Benoit was videotaped falsifying gold card sales, her theft totaled approximately $50.00 to $60.00 each day.  After observing the videotapes, Monroe confronted Benoit about the thefts.  Thereafter, Benoit signed two statements admitting that she stole money, exceeding $500.00, from Burger Master since the start of her employment.  On August 17, 1999, Benoit was arrested after Burger Master notified law enforcement of her acts of theft.

¶7  On August 27, 1999, the Cascade County Attorney filed an Information in the District Court alleging Benoit committed the offense of felony theft, in violation of § 45-6-301(1)(a), MCA (1997), on or between May 1997 and August 1999.

¶8  On October 4, 1999, Benoit entered into a non-binding plea agreement with the Cascade County Attorney's Office.  Therein, Benoit agreed to plead guilty to the charge of felony theft in exchange for a recommendation from the Cascade County Attorney that she receive a two year deferred imposition of sentence based upon the possible imposition of various conditions, including the payment of restitution to Burger Master.  On November 30, 1999, Benoit appeared in District Court and entered a plea of guilty pursuant to the plea agreement.  The District Court ordered that a

pre-sentence investigation ("PSI") report be conducted by the Adult Probation and Parole Bureau.

¶9 Patricia Wooldridge ("Wooldridge"), an Adult Probation and Parole Officer, conducted the PSI and submitted a report to the District Court on March 2, 2000. Wooldridge stated in the PSI that Benoit had no assets and owed approximately $3,105.00 in fines to the Great Falls City Court. In addition, Wooldridge noted that Benoit was unemployed at the time the PSI was conducted, but was seeking employment. Wooldridge further stated that Monroe was in the process of reviewing store records to determine the amount of pecuniary loss sustained by Burger Master and requested additional time to submit a victim impact statement.

¶10 Wooldridge amended the PSI report on March 14, 2000, to include a victim impact statement from Monroe, and Monroe's restitution tabulations for January 1998 through July 1998. Monroe alleged in her statement that Benoit also committed theft by falsifying voided transactions. Monroe explained that Benoit would void a valid transaction and then retain the money paid by the customer. Monroe therefore requested restitution for pecuniary losses sustained by Burger Master resulting from Benoit's falsification of gold card sales and voided transactions. Based upon Monroe's examination of Burger Master's records from January 1998 through July 1998, she calculated an approximate loss of $4,200.00. Monroe, however, noted that her calculation did not include losses sustained from Benoit's falsified gold card sales between August 1998 to August 1999 or falsified voided

4

transactions. Wooldridge thus recommended in the supplemental PSI that "due to the disparity of the amount first charged and the amounts uncovered with further research, that a separate restitution hearing would be beneficial to the victims, the defendant, and Justice in general."

¶11 The District Court conducted a combined restitution and sentencing hearing on August 8 and August 22, 2000. Monroe testified at the hearing and requested a total amount of $15,933.90 in restitution. Without objection, the State introduced into evidence restitution tabulations calculated by Monroe for January 1998 through August 1999.

¶12 Since the specific methods utilized by Monroe in calculating Burger Master's pecuniary losses are critical to our analysis, we will explain those methods in detail. First, to determine the losses resulting from Benoit's falsification of voided transactions, Monroe calculated the total number of voided transactions initialed by Benoit during January 1998 through August 1999. Monroe then assumed 25% of Benoit's voided transactions were legitimate, and thereby subtracted 25% from the total monetary amount of voids conducted by Benoit. The amount totaled $1,833.84.

¶13 Next, Monroe approximated the number of gold card sales Benoit falsified by calculating the total number of gold cards sold by all employees, the total number sold by Benoit, and subtracted the average number of gold cards sold by other employees from the number of gold cards sold by Benoit. Then, Monroe estimated the average monetary amount of each falsified gold card sale by

5

averaging the value of the five different possible gold card item discounts, which ranged in price from $2.50 to $3.25, averaging $3.02 per transaction. Monroe thereafter multiplied the average monetary amount of each gold card sale by the number of estimated sales falsified by Benoit. The amount totaled $12,466.56.

¶14 In addition, Monroe requested restitution for wages paid to three Burger Master employees who assisted in determining restitution by either reviewing records or covering shifts for Monroe and her daughter while they reviewed Burger Master's records. The wages paid to the three employees totaled $1,633.50. Monroe did not document or request restitution for her own time examining Burger Master's records.

¶15 Brian Loucks ("Loucks"), a certified public accountant, testified at the restitution hearing on behalf of Benoit. Loucks alleged that Monroe's assumptions regarding the average value per gold card sale, the number of falsified gold card sales, and the number of falsified voids performed by Benoit were speculative and could alter the amount of actual losses sustained by Burger Master, possibly higher or lower than that calculated by Monroe. He suggested several variables which could be further explored to compile restitution differently, but acknowledged that there is "some guess work" associated with determining losses sustained from employee theft. Loucks, however, did not examine Burger Master's original records nor did he find such a review necessary, as he disputed only the assumptions made by Monroe.

6

¶16 Benoit also testified at the restitution hearing. She admitted that she stole money from Burger Master by falsifying voided transactions and gold card sales since 1998. She further admitted that she was uncertain of the exact amount she stole from Burger Master. Benoit stated that she was employed and her take home pay ranged from $197.00 to $227.00 per week. She listed her various monthly expenses. In addition, Benoit acknowledged that two years would not give her enough time to pay restitution in the amount of $15,933.90.

¶17 At the conclusion of the hearing, the District Court sentenced Benoit to a six year deferred imposition of sentence subject, in part, to the condition that she pay restitution in the amount of $15,933.90. The District Court provided Benoit with the opportunity to withdraw her plea of guilty after two years from the date of entry of its judgment if she satisfied all the conditions imposed therein within that time period. On October 20, 2000, the District Court entered its Judgment of Conviction and Sentencing Order. Benoit appeals.

## STANDARD OF REVIEW

¶18 We review a criminal sentence for legality only. *State v. Pritchett*, 2000 MT 261, ¶ 6, 302 Mont. 1, ¶ 6, 11 P.3d 539, ¶ 6 (citation omitted). Therefore, our review is confined to whether the sentence is within the parameters provided by statute. *Pritchett*, ¶ 6 (citation omitted).

¶19 Our review of constitutional questions is plenary. *Pritchett*, ¶ 27 (citation omitted).

7

ISSUE ONE

¶20 Whether the District Court erred in ordering Benoit to pay restitution in the amount of $15,933.90?

¶21 Benoit's argument is twofold. First, Benoit claims the District Court imposed restitution in violation of § 46-18-242, MCA, since documentation of the victim's pecuniary loss was not provided in the PSI or to the court at the restitution hearing. Secondly, Benoit contends that Monroe's restitution calculations were speculative, and therefore the District Court had no authority to impose restitution for amounts which Monroe could only speculate had occurred through acts of theft. Benoit points out that Monroe examined Burger Master's financial statements daily for the time period in question and never noticed anything that caused her concern prior to August 1999. Benoit alleges the court thus ordered her to pay restitution which was not part of the theft she was "caught performing." Benoit asserts this case should be reversed and remanded to the District Court for a determination of restitution based on the actual amount of provable losses sustained by Burger Master.

¶22 The State responds that the District Court properly assessed the amount of pecuniary loss sustained by Burger Master. The State asserts the requirements of § 46-18-242, MCA, were complied with since the amended PSI included Monroe's analysis of Burger Master's losses resulting from Benoit's theft for seven months, and Monroe presented further documentation at the restitution hearing for the

8

entire time period losses were sustained. Moreover, the State claims Benoit's counsel had ample opportunity to examine Monroe's original records prior to the restitution hearing, but failed to do so. The State further contends the court properly assessed restitution since Burger Master's pecuniary loss was calculated by reasonable methods. The States notes that pecuniary loss is measured by what a victim could recover against an offender in a civil action pursuant to § 46-18-243(1)(a), MCA. The State thus contends that reasonable methods may be employed to determine restitution in the case at hand since we held in *Hostetter v. Donlan* (1986), 221 Mont. 380, 383, 719 P.2d 1243, 1245, that reasonable methods of calculation are permitted in civil cases if losses cannot be ascertained with certainty.

¶23 We will first address whether the District Court had statutory authority to impose restitution in this case. A sentencing court is required to impose a sentence that includes payment of full restitution whenever the sentencing judge finds that a victim of an offense has sustained a pecuniary loss. *See* Section 46-18-201(5), MCA (1997). However, a sentencing judge is not authorized to impose a sentence of restitution until the procedures stated in § 46-18-241, MCA (1997), through § 46-18-249, MCA (1997), are satisfied. *See* Section 46-18-201(5), MCA (1997). *Also see Pritchett*, ¶ 7 (citation omitted). Particularly relevant to the case at hand is whether the court complied with the procedures specified in § 46-18-242, MCA (1997).

¶24 Section 46-18-242, MCA (1997), provides:

9

**Investigation and report of victim's loss.** (1) Whenever the court believes
that a victim of the offense may have sustained a pecuniary loss as a result
of the offense or whenever the prosecuting attorney requests, the court shall
order the probation officer, restitution officer, or other designated person to
include in the presentence investigation and report:

(a) documentation of the offender's financial resources and future ability to
pay restitution; and

(b) documentation of the victim's pecuniary loss, submitted by the victim
or by the board of crime control if compensation for the victim's loss has
been reimbursed by the crime victims compensation and assistance account.

(2) When a presentence report is not authorized or requested, the court
may receive evidence of the offender's ability to pay and the victim's
loss at the time of sentencing.

¶25 We have held that the failure of a PSI to document a victim's pecuniary loss, the offender's financial resources and future ability to pay restitution renders a district court's judgment illegal, as it violates the requirements of § 46-18-242, MCA (1997). *See State v. Muhammad*, 2002 MT 47, ¶ 47, 309 Mont. 1, ¶ 47, 43 P.3d 318, ¶ 47 (citing *Pritchett*, ¶ 13). Here, however, the supplemental PSI included Monroe's tabulations of pecuniary loss sustained by Burger Master from January 1998 through July 1998. Moreover, Wooldridge noted in the supplemental PSI that an evidentiary hearing should be conducted by the court to determine the total amount of loss sustained by Burger Master. The District Court conducted a combined restitution and sentencing hearing, providing both Benoit and the State with the opportunity to present

10

evidence and cross-examine witnesses.  At the hearing, Monroe presented evidence, including her tabulations from January 1998 through August 1999, of pecuniary losses sustained by Burger Master.  Further, Benoit's financial resources were documented in the PSI, and she testified at the sentencing hearing regarding her financial resources and future ability to pay restitution. Consequently, we conclude that documentation of Burger Master's losses, Benoit's financial resources and her future ability to pay restitution were presented to the District Court in compliance with § 46-18-242, MCA (1997).  Therefore, we hold that the District Court had authority to impose restitution.

¶26  Next, we will examine whether the District Court's calculation of pecuniary loss sustained by Burger Master is within parameters provided by statute.  Section 46-18-243(1), MCA (1997), defines pecuniary loss as follows:

> (a)  all special damages, but not general damages, substantiated by evidence
> in the record, that a person could recover against the offender *in a civil*
> *action arising out of the facts or events constituting the offender's criminal*
> *activities,* including without limitation the money equivalent of loss resulting
> from property taken, destroyed, broken, or otherwise harmed and out-of-pocket
> losses, such as medical expenses, loss of income, expenses reasonably
> incurred in obtaining ordinary and necessary services that the victim would
> have performed if not injured, expenses reasonably incurred in attending
> court proceedings related to the commission of the offense . . .
>
> (b)  *reasonable out-of-pocket expenses incurred by the victim in filing*

*charges or in cooperating in the investigation and prosecution of the*
*offense.* [Emphasis added.]

¶27 We have held that a criminal defendant is liable for restitution for offenses to which the defendant has admitted, as a defendant is required to make full restitution for pecuniary losses "arising out of the facts or events constituting the offender's criminal activities," pursuant to § 46-18-241(1), MCA (1997), and § 46-18-243(1)(a), MCA (1997). *See State v. Beavers*, 2000 MT 145, ¶ 11, 300 Mont. 49, ¶ 11, 3 P.3d 614, ¶ 11. *Also see State v. Korang* (1989), 237 Mont. 390, 395-397, 773 P.2d 326, 329-330 (holding that the court did not err in ordering the offender to make full restitution for losses sustained from a time period not alleged in the charging information since the evidence presented at the sentencing hearing established the losses sustained by the victim during that time period arose out of the facts or events constituting the offender's criminal activities).

¶28 Here, the charging information alleged Benoit committed felony theft at Burger Master from May 1997 through August 1999. On November 30, 1999, Benoit pled guilty to the charge of felony theft. Additionally, Benoit admitted at the restitution hearing that she committed theft at Burger Master by falsifying gold card sales and voided transactions since 1998. Consequently, we conclude that Benoit is liable for pecuniary losses sustained by Burger Master resulting from her admitted acts of theft from January 1998 through August 1999.

12

¶29 We will now turn our attention to whether the methods utilized by Monroe in calculating restitution, and subsequently adopted by the court, are within statutory mandates. As the State correctly points out, the amount of pecuniary loss recoverable by Burger Master is measured by the amount of loss recoverable in a civil action. *See* Section 46-18-243(1)(a), MCA (1997). We have held that an award of speculative damages is not allowed in civil cases. *See Stensvad v. Miners and Merchants Bank of Roundup* (1982), 196 Mont. 193, 206, 640 P.2d 1303, 1310 (citation omitted). However, we have held that loss of future profits, although often speculative, are recoverable "[o]nce liability is shown, that is the certainty that the damages are caused by the breach, then loss of profits on a reasonable basis for computation and the best evidence available under the circumstances will support a reasonably close estimate of the loss by a District Court." *See Hostetter*, 221 Mont. at 382-383, 719 P.2d at 1245 (quoting *Stensvad*, 196 Mont. at 206, 640 P.2d at 1310). Consequently, we hold that the losses sustained from Benoit's admitted acts of theft are recoverable, even though the actual losses may be uncertain, if the losses were calculated by use of reasonable methods based on the best evidence available under the circumstances.

¶30 The evidence presented at the hearing in this case establishes that actual losses resulting from Benoit's theft could not be determined with certainty. As a result, Monroe made several assumptions to determine restitution. Benoit's witness, Loucks, disputed the assumptions made by Monroe and suggested several

13

variables which could be further explored to compile restitution, but he acknowledged that there is often "some guess work" associated with determining losses sustained from employee theft. Loucks further acknowledged that implementation of such variables could alter the amount of restitution calculated by Monroe to Benoit's detriment. Moreover, Benoit did not provide the court with a reasonable estimation of the losses sustained by Burger Master. Therefore, we conclude that the methods utilized by Monroe and subsequently adopted by the court were reasonable based on the best evidence available under the circumstances presented in this case.

¶31 We further conclude that Burger Master may recover reasonable out-of-pocket expenses incurred in cooperating in the investigation and prosecution of this case, which are substantiated by the evidence in the record, pursuant to § 46-18-243(1)(b), MCA (1997). Since the record demonstrates that Burger Master incurred out-of-pocket expenses when it paid wages to three employees who assisted, directly and indirectly, in calculating restitution, Burger Master is entitled to such losses. We therefore conclude that the District Court did not exceed its statutory authority when it ordered Benoit to pay restitution in the amount of $15,933.90. Consequently, we affirm the District Court's restitution order.

ISSUE TWO

¶32 Whether the District Court violated Benoit's due process rights under Article II, Section 17, of the Montana Constitution by

14

deferring imposition of her sentence for six years to allow payment of restitution?

¶33 Relying on our decision in *Pritchett,* ¶ 37 (citing *State v. Farrell* (1984), 207 Mont. 483, 676 P.2d 168), Benoit argues the District Court violated her due process rights under Article II, Section 17, of the Montana Constitution when it increased her deferred imposition of sentence from two years, as recommended in the plea agreement, to the maximum allowable deferment period of six years to insure payment of restitution. Benoit asserts her sentence should be reversed and remanded for determination of a length of sentence consistent with her charge and her history instead of her ability to pay restitution.

¶34 In opposition, the State points out that the facts stated in *Farrell* and *Pritchett* are distinguishable from this case since the maximum allowable punishment was not imposed in this case. Rather, the District Court deferred imposition of Benoit's sentence for the maximum allowable period in accordance with § 46-18-201(1)(a)(ii), MCA, which specifically authorizes a deferment for six years "if a financial obligation is imposed as a condition of sentence[.]" The State thus contends the length of Benoit's deferred imposition of sentence was appropriate. We agree.

¶35 Article II, Section 17, of the Montana Constitution provides that: "No person shall be deprived of life, liberty, or property without due process of law." We have held that a criminal defendant's right to due process requires that "indigency or poverty not be used as the touchstone for imposing the maximum

15

allowable punishment." *Pritchett*, ¶ 28 (quoting *Farrell*, 207 Mont. at 499, 676 P.2d at 177).

¶36 The defendant in *Pritchett* pled guilty to burglary and was sentenced to the maximum allowable punishment of twenty years, all of which was suspended based upon the condition that he pay restitution. *Pritchett*, ¶ 26. Since the court sentenced Pritchett to the maximum term based on his indigency, we held that the court violated the defendant's right to due process. *Pritchett*, ¶ 37. Likewise, we held in *Farrell* that the court violated the defendant's due process rights when it based the length of his sentence on his indigency and sentenced him to the maximum allowable punishment of ten years for the offense of theft, all suspended subject to the condition that he make full restitution. *Farrell*, 207 Mont. at 498-499, 676 P.2d at 176-177.

¶37 Here, however, Benoit was not sentenced to the maximum allowable punishment of ten years for the offense of felony theft. *See* Section 45-6-301(7), MCA (1997). Rather, the court imposed a six year deferred imposition of sentence, the maximum allowable period a sentence may be deferred if restitution is imposed as a condition of the sentence pursuant to § 46-18-201(1)(a)(ii), MCA (1997). Therefore, we conclude that the facts presented in *Pritchett* and *Farrell* are distinguishable from the facts in the case at hand.

¶38 Further, the District Court provided Benoit the opportunity to withdraw her plea of guilty prior to the termination of the six year deferred imposition of sentence. Specifically, the District

Court stated that "[a]t any time after a period of two years from the date of this Order, if the Defendant can show that she has satisfied all conditions of this Order, the Court will consider an early request to withdraw her plea of guilty." For the foregoing reasons, we conclude that the District Court did not violate Benoit's due process rights guaranteed by Article II, Section 17, of the Montana Constitution. Accordingly, we affirm the length of Benoit's deferred imposition of sentence.

¶39  Affirmed.

/S/ JIM REGNIER

We Concur:

/S/ KARLA M. GRAY
/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART

17

Justice Terry N. Trieweiler concurring and dissenting.

¶40   I concur with the majority's conclusion that the District Court had authority to impose restitution pursuant to § 46-18-201(5), MCA (1997), and 46-18-242, MCA (1997).  I also concur that the amount of restitution imposed by the District Court was based on a calculation using reasonable methods and the best evidence available under the circumstances.

¶41   I dissent from the majority's conclusion that the District Court did not violate Benoit's right to due process when it extended the length of her deferred sentence from that which had been recommended by the State solely because of her inability to complete payment of restitution within a shorter period of time. The majority Opinion completely misses the point of our decisions in *State v. Farrell* (1984), 207 Mont. 483, 676 P.2d 168, and *State v. Pritchett*, 2000 MT 261, 302 Mont. 1, 11 P.3d 539.  We did not conclude in those cases that defendants' rights to due process had been violated because they received the maximum sentence.  We held that their rights to due process had been violated because the length of  their sentences had been extended because they did not have the financial ability to pay restitution in a shorter period of time.  That is exactly what happened in this case and Benoit's sentence violated her right to due process for the same reasons.

¶42   In *State v. Farrell*, the defendant was charged with and convicted of receiving public assistance based on false statements. He was sentenced to ten years in prison and that sentence was suspended on the condition that he make restitution.  On appeal,

18

this Court first pointed out that based on the colloquy between the trial judge and the defendant, it was apparent that the length of the defendant's suspended sentence was based on the trial judge's conclusion that defendant would not be able to pay the amount of restitution imposed in a shorter period of time. After reviewing various U.S. Supreme Court decisions relating to sentencing and due process, this Court held:

> In the instant case, we believe the appellant's due process rights may have been violated. . . . Nevertheless, we think it arbitrary and unfair in this case to subject the appellant to the maximum sentence simply because of an apparently unsupported notion that he may not be able to make good on the recoupment and restitution within ten years. . . . The record indicates that indigency may have been the criterion for imposing the sentence in this particular case, and we therefore view the sentence in this instance as a possible infringement upon fundamental fairness.

*Farrell*, 207 Mont. at 498, 676 P.2d at 176-77.

¶43 The critical point in *Farrell* was not that the defendant had received the maximum sentence. The point and reason that his case was remanded for resentencing was that the length of his sentence was affected by his indigency and the resulting fact that he could not pay restitution in a shorter period of time. It is clear from this Court's discussion in that case that had Farrell received a nine-year sentence rather than a ten-year sentence solely because he could not complete payment of restitution in a shorter period of time, the result would have been the same. There is no logical basis for linking the result, as the majority does, to the simple fact that in that case, Farrell received the maximum sentence permitted by law.

19

¶44   Sixteen years later, in *State v. Pritchett*, we reaffirmed that linking the length of a defendant's sentence to his or her ability to pay restitution violates that defendant's right to due process of law.   In that case, Pritchett pled guilty to one count of burglary and was given a twenty-year suspended sentence on the condition that he pay restitution in the amount of $62,383.72.   In that case, there was no colloquy between the court and the defendant which indicated that the defendant's length of sentence was tied to his ability to pay restitution.   However, the presentence investigation (PSI) report stated that:

> To give the Defendant adequate time to pay off the restitution in this case the Officer recommends a twenty (20) year sentence to the Montana State Prison, with all of the time suspended.

*Pritchett*, ¶ 3.

¶45   On appeal it was not Pritchett's contention that his sentence violated due process because he received the maximum allowable punishment for burglary.   In the language of our  Opinion, it was Pritchett's contention:

> [T]hat the court based the length of his sentence on the time it would take him to make restitution given his limited financial resources.  He argues that, in basing his sentence on his indigency, the District Court violated his constitutional right to due process.  We agree with both his factual analysis and his conclusion of law. [Emphasis added.]

*Pritchett*, ¶ 26.

¶46   In arriving at our decision in *Pritchett*, we relied on the due process clause of Article II, Section 17 of the Montana Constitution and our prior decision in *Farrell*.   We stated the issue before us as follows:

20

> The question before us, then, is whether the District Court based Pritchett's sentence on the length of time he would need to pay restitution. We find substantial evidence in the record that it did. Our holding in *Farrell* clearly applies and the sentence must be overturned as a violation of Pritchett's right to due process.

*Pritchett*, ¶ 30.

¶47 We acknowledged that unlike *Farrell*, we had no explicit statement from the district judge that Pritchett's sentence was based on the amount of time he would need to pay restitution but concluded, based on the PSI recommendation and other language used by the district court in the rationale for its sentence, that ability to pay was the implicit basis. Therefore, we reversed Pritchett's sentence with the following explanation:

> We hold, as we did in *Farrell*, that, <u>in basing the term of his prison sentence on the defendant's indigency</u>, the District Court violated Pritchett's rights to due process under Article II, Section 17 of the Montana Constitution. [Emphasis added.]

*Pritchett*, ¶ 37.

¶48 The facts that both Farrell and Pritchett received the maximum sentence allowable for their offenses are simply circumstances unique to those cases. Those facts had nothing to do with the result as is evident from the clear language employed in the *Pritchett* decision. We set aside Pritchett's sentence because the district court based "the term of his prison sentence on the defendant's indigency." Based on the District Court's colloquy with Michelle Benoit, it is apparent that she did the same thing. The District Court made the following remarks which are strikingly similar to those made in *Farrell* at the time of Benoit's sentencing hearing:

21

THE COURT:  If I'm going to defer imposition of sentence, it seems to me that the  amount of restitution requires a lengthier deferred imposition of sentence than two years.  [The sentence recommended by the state].  The longest I can give you is six years.  Is that what you want?

THE DEFENDANT:  (No audible response).

THE COURT: All right.  Now, I have to tell you, if I'm still a Judge, when you get done with this, if you get done with it quicker let's say you get some tax refunds, pay them into the restitution then you can get it done quicker.  Sometimes you get those things.

I will allow you to withdraw your plea prior to the six year period of time as long as you fulfill the conditions.  Okay.

So what I'm going to do is for theft by common scheme, a felony, I'm going to defer imposition of sentence for a period of six years.  I will allow you to withdraw your plea any time after two years if you have satisfied all of the conditions.

¶49 Several facts are clear from the District Court's colloquy with the Defendant.  First, the District Court imposed a deferred sentence of six years rather than the two recommended by the State because the District Court did not think Benoit could complete restitution within two years.  Second, six years was the maximum deferred sentence that the District Court could impose.  Third, if Benoit was able to pay restitution in less than six years, the District Court was willing to allow her to withdraw her guilty plea and thereby shorten the period of the deferred sentence.

¶50 The facts of this case come squarely within what was prohibited by our decisions in *Farrell* and *Pritchett*.  What the majority has done is latch onto the inconsequential fact that those defendants received the maximum sentence for their offense rather than the maximum deferred sentence that can be imposed to totally

22

avoid the effect of the due process protection afforded by those decisions. For all practical purposes, other than in the most extreme situations, the majority Opinion renders the rationale for *Farrell* and *Pritchett* meaningless.

¶51 *Farrell* and *Pritchett* stand for a simple but important principle. That principle is that the length of a defendant's sentence should not be affected by the fact that a defendant is indigent. In this case, the length of Benoit's deferred sentence is directly related to her financial status and, therefore, violates the simple but important principle established by our previous cases. For these reasons, I would reverse the sentence imposed by the District Court and remand for resentencing unrelated to Benoit's ability to pay restitution. Because of the majority's refusal to do so, I dissent from the majority Opinion.

/S/ TERRY N. TRIEWEILER